## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CHARLES D. SHEPHERD,              :

        Plaintiff,              :

                                     Case No. 3:10cv0110

 vs.              :

                                     District Judge Thomas M. Rose

MICHAEL J. ASTRUE,              :     Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,              :

        Defendant.              :

## REPORT AND RECOMMENDATIONS[1]

## I.   INTRODUCTION

Plaintiff Charles D. Shepherd sought financial assistance from the Social

Security Administration by applying for Supplemental Security Income ["SSI"]

and Disability Insurance Benefits ["DIB"] on November 14, 2003, alleging

disability since October 1, 2003.  (Tr. 88-90).  He claims to be disabled by bipolar

disorder; liver problems; sleep apnea; depression; a learning disability; back, foot

and knee problems; and carpal tunnel syndrome.  (*See* Tr. 64; *see also* Tr. 770).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

After various administrative proceedings, Administrative Law Judge ["ALJ"] Thomas R. McNichols II issued a decision on August 13, 2007, denying Plaintiff's SSI and DIB applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 15-31).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record, and the record as a whole.

Plaintiff seeks reversal of the ALJ's non-disability finding, or at a minimum, remand of this case to the Social Security Administration to correct certain claimed errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 44 years old at the time of the administrative decision, and thus was considered to be a "younger individual" for purposes of resolving his

2

DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(e); 416.963(e);[2] (*see also* Tr. 767, 805, 30).  He has an 11th grade, "limited," education.  *See* 20 C.F.R. § 416.964(b)(4); (*see also* Tr. 769, 806, 30).  Plaintiff has worked in the past as a material handler, a furniture mover, a bindery operator, a tank cleaner, a foundry worker, and an assembler.  (Tr. 29).

Plaintiff testified at a December 14, 2006, administrative hearing that he last worked in 1998 as a mover, but had stopped working due to "conditions with my bipolar."  (Tr. 770).  He also identified back pain, foot and knee problems, and carpal tunnel syndrome in both hands as additional conditions that forced him to quit working.  (Tr. 770-71; *see also* Tr. 806-07, 808-09, 815-17).  Additionally, Plaintiff said that his right leg swelled "when I stand on my feet" for an extended time, due to deep vein thrombosis, a condition he treated by wearing compression stockings and elevating his leg daily, and by taking Coumadin.  (Tr. 772-74; *see also* Tr. 807-08, 817-18).  He also suffered from hepatitis C, which "makes me feel really tired," and for which he had received 44 weeks of chemotherapy.  (Tr. 774-75; *see also* Tr. 809).

Plaintiff had been in counseling once a week for "about five or six years," and felt that counseling and medication helped "some" with his bipolar disorder

---

[2]The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

and depression. (Tr. 775-77; *see also* Tr. 809-12). Bipolar disorder made him

"really miserable at times," including mood swings and temper issues (Tr. 775),

and he also suffered from depression. (Tr. 776-77). Plaintiff took Vicodin for

back pain. (Tr. 780-82). He admitted to past problems with alcohol and drugs

(Tr. 788, 813) and to having lost his driver's license due to a DUI conviction (Tr.

768-69, 788, 806), but denied any current substance use. (Tr. 788, 813-15, 818-21).

At a supplemental hearing held on July 23, 2007, Plaintiff largely repeated

and confirmed his prior testimony. (Tr. 805-21). Dr. Mary Eileen Buban, a

clinical psychologist, then testified as a medical expert. (Tr. 821-29). Having

reviewed Plaintiff's medical record, Dr. Buban did not question Plaintiff's

psychological diagnoses (Tr. 821), but observed "that when he has taken his

medications regularly and complied with treatment, his symptoms improve

dramatically." (Tr. 822). She continued:

> When he is completely sober, not using[,] and taking his
> medications, his depression lessens, his anxiety lessens,
> he has no auditory hallucinations[,] and his mood in
> general improves. And so what I see with the record
> with sobriety is improvement in terms of his symptoms.

(*Id.*). Dr. Buban considered the record "very confusing" as to the "material" issue

of Plaintiff's current use of drugs and alcohol. (Tr. 825; *see also* Tr. 827). Noting

that Plaintiff "would have some limitations" due to bipolar disorder as well as

4

cocaine, alcohol and cannabis dependence (Tr. 822), Dr. Buban nonetheless concluded that Plaintiff did not meet or equal any listing, "[b]ecause it appears that when he is compliant with medications and treatment, there is improvement of [his] mental health." (Tr. 823).

Although other psychological diagnoses were proposed in the record, including a possible traumatic brain injury (*see* Tr. 823, 824), Dr. Buban "d[id] not see a lot of evidence" to support those diagnoses. (Tr. 824). She also questioned some of the "highly unusual" procedures employed during Plaintiff's most recent psychological evaluation. (Tr. 824-25). She opined that Plaintiff should be placed in a low stress work environment, eliminating complex tasks or dealing with the public, and limiting contact with co-workers and supervisors to occasional. (Tr. 825-26). Despite opinions from multiple mental health care providers that Plaintiff could not work, Dr. Buban based her opinion of Plaintiff's limitations "on the current record and the improvement that is shown mostly recently." (Tr. 828).

Vanessa Harris, a vocational expert ["VE"], also testified at the supplemental hearing. (Tr. 830-38). She classified all of Plaintiff's past relevant work as either unskilled or semi-skilled, at exertional levels from medium to very heavy. (Tr. 831). Asked about a hypothetical individual with Plaintiff's

5

characteristics, a residual functional capacity ["RFC"] for medium work, and limited to no climbing of ropes, ladders or scaffolds; occasional climbing of stairs, stooping and kneeling; not required to maintain concentration on a single task for more than 15 minutes at a time; no more than occasional exposure to extremes of hot, cold or humidity; no direct dealing with the general public; and no exposure to hazards such as dangerous machinery or unprotected heights (Tr. 831-32), the VE testified that such a person could perform 4,000 medium unskilled jobs; 4,500 light unskilled jobs; and 3,000 sedentary unskilled jobs available in the regional economy. (Tr. 832). Adding an additional limitation of lifting or carrying 50 pounds only occasionally and 10 pounds frequently would not affect those numbers (Tr. 832-33), but adding another limitation of standing and/or walking no more than two hours in a typical workday would eliminate all positions at the medium exertional level, while leaving the number of light and sedentary positions the same. (Tr. 833). Those remaining light and sedentary positions also would not be affected by limiting the individual to only occasional contact with co-workers or supervisors, or to low stress jobs with no production quotas or over-the-shoulder supervision. (Tr. 833-34). Finally, the VE testified that Plaintiff would be unable to do any of his past work, and that he would have no transferable skills. (Tr. 834).

The parties have provided detailed and informative descriptions of Plaintiff's medical records and other pertinent evidence in the record. (*See* Doc. #8 at 4-12; Doc. #12 at 2-7). Summarizing some of these medical records and opinions will help to frame further review.

Plaintiff avers that his "primary disabling impairment is psychological." (Doc. #8 at 3). The record shows that Plaintiff sought treatment for psychological symptoms as early as 1996 (*see* Tr. 285-316), with additional psychological intervention in December 2001 and January 2002, when Plaintiff was hospitalized at Miami Valley Hospital ["MVH"] after reporting suicidal and/or homicidal thoughts. (Tr. 316A-363). Plaintiff thereafter was referred to Eastway Behavioral Healthcare ["Eastway"] for further mental health treatment. (*See* Tr. 484).

On August 7, 2003, Plaintiff saw Timothy Todd, M.D., a psychiatrist at Eastway, for diagnoses of bipolar disorder not otherwise specified ["NOS"], and cocaine, alcohol and marijuana dependence, in remission. (*See* Tr. 253). At that time, Plaintiff also reported "a history of brain injury secondary to a motor vehicle accident." (*Id*.). Dr. Todd recommended that Plaintiff's symptoms be treated with specific prescription medications. (*See id.*, Tr. 242). At a follow-up appointment on October 31, 2003, Plaintiff reported increasing anxiety, irritability and agitation, as well as "hearing a voice only at bedtime calling out his name."

7

(Tr. 253).  Dr. Todd adjusted Plaintiff's medications and advised him to return as needed.  (Tr. 254).

On November 25, 2003, a "community support specialist" at Eastway, Sara Workman, completed a form for the Ohio Bureau of Disability Determination ["BDD"], indicating that Plaintiff was "very moody and unpredictable," had difficultly communicating with others, and was "frustrated easily."  (Tr. 245). She described Plaintiff as being very reliant on others as a result of his illness. (Tr. 245-49).  He was being seen at Eastway one or two times per week.  (Tr. 249).

On January 2, 2004, after two months of complying with his prescribed medication regimen, Plaintiff reported "doing much better," having "less anxiety" and being "able to cope . . . better" with stressors in his life.  (Tr. 244). Dr. Todd advised Plaintiff to continue therapy and medications, and to "attend AA meetings" once a week in order to "maintain sobriety."  (Tr. 243).  Dr. Todd thereafter continued to see Plaintiff every two months for medication management, through May 2004.  (*See* Tr. 238-41).  That month, Dr. Todd completed a mental functional capacity assessment form for the Ohio BDD, indicating that Plaintiff was "markedly limited" in his ability to maintain attention and concentration for extended periods, and "moderately limited" in 15 other categories of work-related abilities.  (Tr. 417-18).  He opined that Plaintiff

8

was "[u]nemployable" for at least a year due to bipolar disorder; cocaine, cannabis and alcohol dependence, in remission; brain injury; hepatitis C; and gastroesophageal reflux disease ["GERD"].  (Tr. 418).

Plaintiff continued regular treatment at Eastway (Tr. 236-37, 569-73), with Dr. Todd occasionally adjusting his medications, according to his symptoms. (*See, e.g.*, Tr. 569).  On January 24, 2005, Dr. Todd again completed a mental functional capacity assessment forms for the Ohio BDD, largely echoing his May 2004 findings, but indicating that Plaintiff had become "markedly limited" in a total of 10 areas of functioning, and remained "[u]nemployable."  (Tr. 414-15).  In April 2005, Ms. Workman reported that Plaintiff's depression was "lessening," but he "ha[d]n't been to group [therapy] in several months" and "want[ed] to return" because the group "aided w[ith] his sobriety issues."  (Tr. 562).  On July 15, 2005, Dr. Todd again completed an assessment for the Ohio BDD, this time indicating that Plaintiff was "markedly limited" in five areas of functioning, but still "[u]nemployable."  (Tr. 411-12).

Plaintiff continued therapy at Eastway.  (Tr. 544-58).  In January 2006, Plaintiff reported that he had "smoked [one] joint" since his last visit.  (Tr. 542). The following month, Plaintiff told Ms. Workman that he "was out of his meds due to no coverage."  (Tr. 540).  On March 1, 2006, having "been off" two of his

prescribed medications for seven weeks, Plaintiff reported increased depression, anxiety, and irritability, and decreased ability to cope. (Tr. 539). Dr. Todd at that time noted that Plaintiff's overall functioning was decreased "due to non-compliance [with] meds," and provided some samples. (*Id.*). On March 31, 2006, Plaintiff reported that he had been complying with his medications and felt "better." (Tr. 537).

Plaintiff failed to show for appointments in April and May of 2006. (Tr. 534-35). When Plaintiff admitted in June 2006 that he had drunk "a beer" and smoked marijuana "a couple of times" since his last visit, Dr. Todd revised his substance dependence diagnosis from "in remission" to "in <u>partial</u> remission." (Tr. 531) (emphasis added). The record then reflects an extended period of spotty compliance with treatment. (*See generally* Tr. 687-731). Plaintiff failed to appear for an appointment on July 13, 2006. (Tr. 728). On July 25, 2006, Plaintiff reported "some [alcohol or drug] use over [the] past week." (Tr. 725). On July 27, 2006, he again failed to appear for an appointment. (Tr. 724). On August 7, 2006, Plaintiff denied any alcohol or drug use during the prior week. (Tr. 720). The next day, he reported feeling "a little better" (Tr. 719), but he failed to show for an appointment on August 10, 2006. (Tr. 718). On August 15, 2006, he reported feeling "rough" and "groggy" (Tr. 717), although he denied use of drugs

or alcohol.  (Tr. 716).  Two weeks later, however, Plaintiff admitted "smok[ing] [two] joints" and "intermittent alcohol use" during the prior two weeks, including three beers the night before his appointment.  (Tr. 715).

On August 29, 2006, Dr. Todd prepared a fourth assessment for the Ohio BDD.  (Tr. 732-33).[3]  This time, he found that Plaintiff was "markedly limited" in nine areas of functioning, "moderately limited" in eight other areas, and still "[u]employable" due to bipolar disorder NOS; "intermittent" alcohol, cocaine and cannabis dependence; brain injury; hepatitis C; GERD; deep vein thrombosis; and back pain.  (Tr. 733).

Plaintiff canceled his October 10, 2006 appointment (Tr. 712); on October 11, 2006, he reported "smoking 'weed'" over the past week.  (Tr. 711).  Plaintiff did not show for appointments on October 25 and 27, 2006.  (Tr. 709).  On October 31, 2006, Plaintiff reported "some use when 'bored.'" (Tr. 707).  This pattern of sporadic drug or alcohol use and missed appointments continued. (*See, e.g.*, Tr. 703, 700).

On November 30, 2006, Paul Hanley, M.D., became Plaintiff's new treating psychiatrist at Eastway.  (Tr. 699).  On that date, Plaintiff reported "cutting down his drinking to only [three] to [four] beers per day."  (*Id.*).  On December 21, 2006,

---

[3]Plaintiff's Statement of Errors incorrectly attributes this assessment to Dr. Paul Hanley. (*See* Doc. #8 at 7).

11

stating that he "ha[d] stopped drinking and ha[d] not had any alcohol in over three weeks," Plaintiff reported "doing better except for his chronic pain." (Tr. 697). Plaintiff canceled his appointment the following week (Tr. 696), and also failed to show as scheduled on January 4, 2007. (Tr. 695). Plaintiff's January 11, 2007 session with Dr. Hanley essentially echoed his December 21, 2006 session. (Tr. 693).

On January 16, 2007, Dr. Hanley prepared a new assessment for the Ohio BDD (Tr. 599-600), indicating that Plaintiff was "extremely limited" in eight areas of functioning and "markedly limited" in nine other areas. (Tr. 599). He opined that Plaintiff was "unemployable" for 12 or more months due to "chronic cognitive slowing that may be the result of either his schizoaffective disorder[, . . .] a history of traumatic brain injury, or . . . a combination of both. (Tr. 600).

On January 22, 2007, Plaintiff reported "maintain[ing] his sobriety for over a month." (Tr. 691). He was "doing well psychiatrically" except for a lack of funds to pay for his medications. (*Id.*). Plaintiff's status was largely unchanged on January 29, 2007, except for "a counting compulsion" suggesting "O[bsessive ]C[ompulsive ]D[isorder] as a possible additional diagnosis." (Tr. 690). On February 12, 2007, Plaintiff reported complying with his medications and a "good" mood, and "denie[d] recurrence of symptoms at this time." (Tr. 688).

12

Plaintiff failed to show for his March 5, 2007 appointment.  (Tr. 685).  A week later, he reported being "clean" for six weeks, but "continue[d] to have problems with depressed mood" and "feeling paranoid."  (Tr. 684).  His depression was "improved" on March 26, 2007, and he denied any paranoia.  (Tr. 681).  On April 26, 2007, Plaintiff claimed two months of sobriety, and told Dr. Hanley "that when he has used in the past[, . . .] the alcohol and drugs ha[ve] interfered with his medications working effectively."  (Tr. 679).  Treatment notes from May 21, 2007, however, show that Plaintiff reported "no AOD [alcohol or drug] use for 2 ½ <u>weeks</u>" (Tr. 678) (emphasis added), suggesting that he relapsed in early May 2007.  Treatment notes from May 24, 2007, refer to "discrepancies of AOD use."  (Tr. 677).  Plaintiff canceled a June 4, 2007 appointment.  (Tr. 676).  On June 6, 2007, Plaintiff reported "being clean and sober since April 2007," but had run out of his medications.  (Tr. 675).  On June 13, 2007, Plaintiff reported "feeling better since being on his meds."  (Tr. 674).

On June 7, 2004, state agency psychologist Guy G. Melvin, Ph.D., reviewed Plaintiff's psychological medical record.  (Tr. 265-79).  He concluded that Plaintiff was mildly to moderately limited in his ability to maintain social functioning (Tr. 275), but "appear[ed] capable of performing simple, routine tasks in an environment where he would not have to work in close relation[ to] others."  (Tr.

279).  Psychologist J. Rod Coffman, Ph.D., thereafter affirmed Dr. Melvin's opinion.  (*Id.*).

On May 14, 2007, psychologist Gordon A. Harris, Ph.D., examined Plaintiff at the request of the state agency.  (Tr. 665-72).  Plaintiff reported symptoms including mood swings, trouble getting along with others, irritability, anxiety, and trouble sleeping.  (Tr. 665-66).  He also claimed to have suicidal ideation once a month, crying episodes every other day, and auditory hallucinations every two weeks.  (Tr. 666).  Dr. Harris's report also states that Plaintiff "indicated that he smokes pot about once a week and drinks alcohol almost every day," but shortly thereafter states that Plaintiff "claims he quit both of these several years ago." (*Id.*).  Dr. Harris diagnosed bipolar disorder NOS, schizophrenia, and polysubstance abuse.  (Tr. 667).  He "also suggest[ed]" that Plaintiff "has a personality disorder, involving paranoid traits."  (*Id.*).  He concluded that Plaintiff's ability to follow instructions or to maintain attention to perform simple, multi-step and/or repetitive tasks would be moderately impaired; and that his abilities to relate to others, including fellow workers and supervisors, or to withstand the stress and pressure associated with day-to-day work activities would be severely impaired.  (Tr. 668).

14

Plaintiff also relies on medical records related to his physical impairments. Since at least March 2002 (*see* Tr. 483), Plaintiff has obtained primary care at the MVH outpatient clinic, for additional problems including low back pain, carpal tunnel syndrome, hepatitis C, deep vein thrombosis, sleep apnea, osteoarthritis, and left hip pain.  (*See generally* Tr. 424-482).  On February 18, 2004, Dr. Jayeshkuma Patel, a primary care physician at MVH, completed a basic medical form (Tr. 364-65) indicating that Plaintiff was "[u]nemployable" for nine to 11 months due to complaints of "mechanical back pain."  (Tr. 365).  On January 20, 2005, and again on July 2005, Monique Goma, another MVH physician, completed additional such forms, opining that Plaintiff suffered from obesity, bipolar disorder, hepatitis C, peripheral neuropathy, sleep apnea, deep vein thrombosis, and osteoarthritis (Tr. 420, 422), and could not work for at least 12 months.  (Tr. 421, 423).  Plaintiff thereafter continued to be treated at MVH for pain and other problems related primarily to deep vein thrombosis and osteoarthritis.  (Tr. 372, 380-410, 425-26, 433-40, 443, 445, 597, 622-24, 629-63, 734).

On March 17, 2004, Damian M. Danopulos, M.D., examined Plaintiff at the request of the state agency.  (Tr. 224-32).  Plaintiff weighed 290 pounds, and reported having gained at least 70 pounds in the prior two years.  (Tr. 225). Plaintiff gave what Dr. Danopulos considered to be "a reliable history" of low

back pain and bilateral wrist, knee and foot pain.  (Tr. 224-25).  He also reported being treated for bipolar disease, as well as a past history of heavy alcohol use and cocaine and marijuana use.  (Tr. 225).  Dr. Danopulos diagnosed left-sided carpal tunnel syndrome; arthralgias of the lumbar spine, knees and hips; untreated hepatitis C; morbid obesity; and bipolar disease.  Dr. Danopulos felt that Plaintiff's ability to perform work-related activities was "not affected" by his somatic complaints, except the morbid obesity.  (Tr. 228).

On June 9, 2004, agency physician Willa L. Caldwell, M.D., reviewed Plaintiff's medical record.  (Tr. 280-84).  She concluded that Plaintiff could perform work at the medium exertional level, with restrictions to occasional stooping and crouching.  (Tr. 281-82).  Reviewing physician Jon E. Starr, M.D., concurred in that assessment on October 13, 2004.  (Tr. 284).

On March 14, 2007, Dr. Danopulos performed a second evaluation.  (Tr. 602-18).  Plaintiff weighed 257 pounds, was using a cane, and complained of constant low back pain, bilateral carpal tunnel pain, and foot pain, as well as effort-related shortness of breath.  (Tr. 602-03, 604).  Examination revealed full range of motion in the upper and lower extremities, with some pain in the feet and slight swelling of the right ankle.  (Tr. 605).  Gait was "normal" and the cane "not obligatory;" Plaintiff's spine "<u>was painless to pressure</u>."  (*Id.*) (emphasis in

16

original).  Plaintiff was using a CPAP machine for his sleep apnea.  (Tr. 606).

Considering all of Plaintiff's physical impairments, Dr. Danopulos concluded

that Plaintiff's ability to do work-related activities would be "affected in a

negative way" by his morbid obesity, which triggered his sleep apnea and

restrictive lung disease; by "mild osteoarthritic changes" in his spine and hip;

and by his left-sided mild carpal tunnel syndrome.  (Tr. 607).

## III.    THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.    <u>Applicable Standards</u>

To be eligible for SSI or DIB, a claimant must be under a "disability" within

the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The

definition of the term "disability" is essentially the same for both DIB and SSI.

*See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its

statutory meaning, a "disability" includes only physical or mental impairments

that are both "medically determinable" and severe enough to prevent the

applicant from (1) performing his or her past job and (2) engaging in "substantial

gainful activity" that is available in the regional or national economies.  *See id*.  A

DIB/SSI applicant bears the ultimate burden of establishing that he or she is

under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v.*

17

*Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4); (*see also* Tr. 24). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

18

### B.    The ALJ's Decision

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2003, the alleged onset date, and continued to meet the disability insured-status requirements through September 30, 2004.  (Tr. 19).

The ALJ found at Step 2 that Plaintiff has the severe impairments of intermittent pain and swelling of the right leg due to chronic deep vein thrombosis; intermittent back and left hip pain due to arthralgias; obesity with a related history of restrictive lung disease; a bipolar/schizoaffective disorder; and an ongoing history of alcohol, cocaine, and cannabis dependence.  (Tr. 19-20). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P.  (Tr. 22).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity to perform light work, subject to the following restrictions: lifting and carrying 10 pounds frequently and no more than 50 pounds occasionally; must be permitted to alternate sitting and standing for 10-15 minutes at least every two hours; can stand and/or walk no more than two hours per day; no more than occasional kneeling, stooping, climbing stairs, or working in environments where

19

he would be exposed to temperature extremes or high humidity; no climbing ladders, ropes, and scaffolds; no working around hazards; and only low-stress jobs with no production quotas, no over-the-shoulder supervision, no concentrating on a single task for more than 15 minutes at a time, no more than occasion contact with co-workers and supervisors, and no direct dealing with the general public.  (Tr. 23).  Applying this assessment, the ALJ found that Plaintiff could not perform his past relevant work as a material handler, furniture mover, bindery operator, tank cleaner, foundry worker, or assembler (Tr. 29), but was capable of performing a significant number of other jobs in the national economy. (Tr. 30).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for SSI or DIB.  (Tr. 31).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

21

V.      **DISCUSSION**

A.      **The Parties' Contentions**

Plaintiff raises two related challenges to the ALJ's decision.  Noting that

two treating psychiatrists opined that Plaintiff had a disabling mental

impairment, and urging that the mental health record supports those opinions,

Plaintiff first contends that the ALJ's RFC finding is not supported by substantial

evidence.  (Doc. #8 at 1, 13-18).  Similarly, Plaintiff argues that the ALJ's RFC

finding is not supported by substantial evidence because two treating primary

care physicians found that Plaintiff was unable to work due to the combined

effect of his psychological and physical impairments.  (*Id.* at 2, 18-20).

The Commissioner argues that the ALJ reasonably determined that the

treating psychiatrists' and the treating physicians' assessments "were extreme

and merited minimal weight."  (Doc. #12 at 10).  Defendant further details

specific reasons why the ALJ purportedly was justified in discounting the

opinions of Drs. Patel (*id.* at 11-13), Goma (*id.* at 13-15), Todd (*id.* at 15-17), and

Hanley.  (*Id.* at 18-19).

B.      **Medical Source Opinions**

1.      <u>*Treating Medical Sources*</u>

22

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544). More weight generally is given to the opinions of examining medical sources than to the opinions of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). Yet the opinions of non-examining state agency medical consultants have some value, and under some circumstances can be given significant weight. *See infra.*

23

2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §416.927(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §416.927(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §416.972(f); *see also* Ruling 96-6p at *2-*3.

**C.    Analysis**

1.    *Plaintiff's Psychological Limitations*

Although the "Issues" as set forth in Plaintiff's Statement of Errors urge that the ALJ's RFC finding is not "supported by substantial evidence" as to Plaintiff's mental impairments (*see* Doc. #8 at 1), the record leaves little doubt that Dr. Buban's testimony as the designated medical expert constitutes "substantial

evidence" supporting the limitations found by ALJ McNichols. (*See* Tr. 823, 825-26); *see also* Social Security Ruling 96-6p, 1996 WL 374180 at *2. The arguments presented within Plaintiff's memorandum, however, make clear that Plaintiff's challenge to the RFC finding actually is directed less toward the existence of "substantial evidence" supporting the ALJ's decision than to his handling of the opinions of Plaintiff's treating psychiatrists. (*See* Doc. #8 at 13-18).

The ALJ is responsible for weighing the record evidence, including medical source opinions, and determining whether a claimant is under a "disability." *See* 20 U.S.C. § 416.927(e). Where the opinion of a treating medical source either is inconsistent with other substantial evidence of record or is not well supported by medically acceptable data, applicable law provides that an ALJ is not required to accord that opinion controlling weight. *See Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. Here, the record shows that while all of the psychological medical sources essentially agree with Plaintiff's diagnoses of bipolar disorder and substance dependency, their opinions vary greatly as to the degree to which those conditions limit Plaintiff's ability to work. For example, while both Dr. Hanley and Dr. Todd believed that Plaintiff's ability to maintain attention and concentration, among other traits, was so "limited" as to render him "[u]nemployable" (*see* Tr. 599-600, 417-18, 414-15, 411-12, 732-33), Dr. Buban felt

that those dire assessments did not accurately represent Plaintiff's abilities "when he is compliant with medications and treatment." (Tr. 823). To the contrary, Dr. Buban opined that Plaintiff's only work-related mental limitations would be placement in a low-stress work environment, together with eliminating complex tasks and dealing with the public, and limiting contact with co-workers or supervisors to only occasional. (Tr. 825-26). In light of that patent inconsistency, the ALJ did not err in refusing to give controlling weight to the treating psychiatrists' opinions.

Having properly declined to accord those opinions controlling weight, however, ALJ McNichols still was required to determine how much weight was appropriate "by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544). Here the "specialization" factor was of little relevance, as all of the pertinent medical sources are mental health professionals. But the ALJ's continued analysis of Dr. Hanley's opinion confirms that he touched on the "supportability" factor and found that Dr. Hanley's opinion was <u>not</u> supportable. He stated as follows:

26

> Dr. Hanley's assessment is . . . inconsistent with the progress notes he prepared in connection with [Plaintiff's] treatment at Eastway.  Those progress notes . . . show that [Plaintiff] was stable from a psychological standpoint by 2003 and that his symptoms were under good control with medication.  Dr. Hanley specifically estimated [Plaintiff's] GAF score at 55, which is indicative of no more than "moderate"-level limitations.  The "marked" level limitations Dr. Hanley then identified in his mental functioning capacity assessment are inconsistent with [Plaintiff's] level of psychological functioning and again, to the extent that they are accurate, appear to be based upon [Plaintiff's] ongoing history of substance abuse.  Therefore, I . . . accord Dr. Hanley's assessment only minimal weight.

(Tr. 27) (citations to record omitted).

Although the ALJ used the term "inconsistent" in comparing Dr. Hanley's opinion to his own clinical findings, the ALJ's analysis clearly amounts to a conclusion that Dr. Hanley's assessment was not <u>supported</u> by his treatment observations or assigned GAF score.  (*See id.*).  Moreover, because the record reveals that Dr. Hanley first saw Plaintiff on November 30, 2006 (*see* Tr. 699), and rendered his opinion that Plaintiff was "unemployable" on January 16, 2007 (*see* Tr. 599-600), after only a few sessions, the "length," "nature," and "extent" of their treatment relationship also do not warrant great deference to Dr. Hanley's opinion.  Accordingly, the ALJ cannot be said to have erred in giving Dr. Hanley's opinion "only minimal weight."  (Tr. 27).

Similarly, in discussing Dr. Todd's successive disability opinions, the ALJ
stated as follows:

> [T]he opinion expressed by Dr. Todd in his mental
> functional capacity assessments differs markedly from
> the progress notes he prepared for [Plaintiff] at Eastway.
> The records show that there has, if anything, been an
> improvement in [Plaintiff's] level of psychological
> functioning between 2004 and 2006.  Dr. Todd's most
> recent assessment in which he found mostly "marked"-
> level limitations is inconsistent with the GAF scores
> noted at Eastway, which were no lower than [ ] 50 and
> have been as high as 70.  As Dr. Buban noted, Dr. Todd
> prepared these mental functional capacity assessments
> during periods of acute substance abuse by [Plaintiff],
> and, as such, these assessments do not provide a basis
> for awarding benefits even if [Plaintiff] were truly
> limited to the point where he would be considered
> disabled.  Moreover, . . . . Dr. Todd's conclusion that
> [Plaintiff] is unemployable invades the province of the
> Commissioner . . . and cannot be accorded significant
> weight for this reason as well.  The mental functional
> capacity assessments submitted by Dr. Todd were
> completed for the purpose of assisting [Plaintiff] in
> obtaining welfare benefits.  Neither of these assessments
> include objective psychological findings which support
> the profound level of restriction ultimately opined by
> Dr. Todd . . .  Accordingly, Dr. Todd's opinion is
> entitled to only minimal, and clearly not deferential,
> weight.

(Tr. 27).  Thus, the ALJ again concluded that the treating physician's opinion did
not warrant deference based on the "supportability" factor.  (*See id.*).

In this instance, however, the ALJ's failure to explicitly address aspects of the "treatment relationship" between Dr. Todd and Plaintiff is more problematic. Unlike Dr. Hanley, who had treated Plaintiff for only two months and three visits before opining that Plaintiff was disabled, Dr. Todd treated Plaintiff from at least August 7, 2003 (*see* Tr. 253) through August 29, 2006 (*see* Tr. 732-33), during which time he opined on four separate occasions as to Plaintiff's mental limitations. (*See* Tr. ). By discounting Dr. Todd's opinions without ever addressing the length, nature and extent of his treatment relationship with Plaintiff, *see Blakley,* 581 F.3d at 406 (citing *Wilson,* 378 F.3d at 544), the ALJ does not appear to have given due consideration to factors that the Commissioner has said <u>must</u> be taken into account in determining the weight given to the opinion of a treating physician. Specifically, the Regulations instruct as follows:

> Adjudicators must remember that a finding that a treating source's medical opinion is not well-supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source opinions are still entitled to deference and must be weighed using <u>all</u> of the factors provided in 20 C.F.R. § 404.1527 . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p (emphasis added).  Because the ALJ did not heed this instruction, he did not apply the correct legal criteria to Dr. Todd's opinions, and his evaluation of those opinions thus constitutes an error of law.  *See Bowen*, 478 F.3d at 746.

### 2. *Plaintiff's Physical Limitations*

Having concluded that the ALJ committed an error of law by not fully considering Dr. Todd's opinions regarding Plaintiff's psychological limitations, the Court need not closely examine Plaintiff's remaining arguments in order for Plaintiff to be entitled to some form of relief.  Nevertheless, the Court notes for the record that the ALJ did <u>not</u> err as a matter of law by declining to defer to the opinion of treating physician Dr. Patel (*see* Tr. 24-25), given that Dr. Patel's opinion regarding Plaintiff's purported disability indicated that such condition was expected to last for only nine to 11 months.  (*See* Tr. 365).  By definition, Social Security benefits are available only for disabling conditions expected to last for at least 12 continuous months.  *See* 20 C.F.R. § 404.1505(a).

Additionally, because the ALJ detailed and reasonably explained his reasons for giving Dr. Goma's opinions "only minimal weight" (*see* Tr. 25), and because the opinions of examining physician Dr. Danopulos (Tr. 224-32; 602-618) and reviewing physicians Drs. Caldwell and Starr (Tr. 280-84) appear to

constitute substantial evidence supporting the ALJ's physical RFC findings,

Plaintiff's challenge to that aspect of the ALJ's decision is not well taken.

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual

conclusions are not supported by substantial evidence, the Court must decide

whether to remand the case for rehearing or to reverse and order an award of

benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to

affirm, modify, or reverse the Commissioner's decision "with or without

remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).

Remand is appropriate if the Commissioner applied an erroneous principle of

law, failed to consider certain evidence, failed to consider the combined effect of

impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of*

*Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming and because the evidence of a

disability is not strong while contrary evidence is weak.  *See id.*  Nevertheless,

Plaintiff is entitled to an Order remanding this case to the Social Security

Administration pursuant to Sentence Four of § 405(g), due to the problems

detailed above.  On remand, the ALJ should be directed to (1) evaluate Plaintiff's

testimony and the evidence of record, including the medical source opinions,

under the applicable legal criteria mandated by the Commissioner's Regulation

and Rulings and by case law; and (2) evaluate Plaintiff's disability claim under

the required five-step sequential analysis to determine anew whether Plaintiff

was under a disability and whether her applications for SSI or DIB should be

granted.

### IT THEREFORE IS RECOMMENDED THAT:

1.    The ALJ's non-disability determination be VACATED;

2.    No finding be made regarding whether Plaintiff is under a
      "disability" within the meaning of the Social Security Act;

3.    This matter be REMANDED to the Social Security
      Administration pursuant to Sentence Four of 42 U.S.C. §
      405(g) for further proceedings consistent with this Report and
      Recommendations and with any decision adopting this Report
      and Recommendations; and

4.    The case be TERMINATED on the docket of this Court.


February 9, 2011                    _____s/ Sharon L. Ovington_____
                                         Sharon L. Ovington
                                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).